UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE ROLANDO GONZALEZ,<br><br>Defendant. | 4:22-CR-40119-KES<br><br><br>AMENDED REPORT AND<br>RECOMMENDATION |

**INTRODUCTION**

Defendant Jose Rolando Gonzalez is before the court on a superseding indictment charging him with conspiracy to distribute methamphetamine.  See Docket No. 28.  Mr. Gonzalez has filed a motion to suppress certain evidence.  See Docket No. 35.  The United States ("government") resists the motion.  See Docket No. 41.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD L.R. 57.11.

**FACTS**

An evidentiary hearing was held on June 27, 2023.  Mr. Gonzalez was there in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley.  The government was represented by its Special Assistant United States Attorney, Paige Peterson.  Three witnesses testified and 11

exhibits were received into evidence.  From this testimony and these exhibits the court makes the following findings of fact.

On September 25, 2022, at 9:12 a.m., Isaiah Broken Leg made a 911 call to the Moody County, South Dakota, dispatch office.  Ex. A.  Mr. Broken Leg reported that while he had been traveling north on Interstate 29 ("I-29") he had observed a northbound black Volvo sedan being operated either by a distracted or drunk driver.  Id.  He described seeing the Volvo crossing onto the shoulder and then crossing over into the left travel lane.  Id.  The operator told Mr. Broken Leg she would try to get an officer to report to the scene.  Id.

The usual procedure under these circumstances would have been for the dispatcher to radio on the state law enforcement radio for a South Dakota Highway Patrol Trooper to address this report.  However, at the time of Mr. Broken Leg's call, Trooper Chris Spielman was in the same building as the dispatcher—both were at the Moody County Sheriff's Office in the city of Flandreau.  So rather than radioing for assistance, the dispatcher simply relayed the contents of the 911 call in a face-to-face conversation with Trooper Spielman.  The substance of Mr. Broken Leg's report was not broadcast over the radio.

Trooper Spielman testified that the dispatch officer told him the black Volvo sedan had been observed at mile marker 109 on I-29.[1]  Trooper Spielman

---

[1] This court could not discern from the 911 audio recording whether Mr. Broken Leg relayed the mile marker location information.  See Ex. A. Possibly the dispatcher had access to technology that allowed them to pinpoint the location from which Mr. Broken Leg was calling.  See NCT911, *How Does Location Work for 911*, https://nct911.org/how-location-works-for-911/ (last

immediately set about driving the approximately seven miles from Flandreau to I-29 and then began traveling north on the interstate attempting to locate the Volvo.  He never did locate the suspect Volvo on the interstate.

At 9:27 a.m. the same morning, an anonymous female called 911 to report she was traveling north on I-29 and saw a black car with dark tinted windows also traveling north and approaching the Elkton exit.  Ex. B.  The woman described the vehicle veering from grass line to grass line across the interstate and moving at about 65 miles per hour rather than the speed limit of 80 miles per hour.  Id.  The caller declined to identify herself or to sign a complaint.  Id.  She stated she observed no cracked windshield, bumper stickers, or dents that would further identify the car.  Id.

This 911 phone call was also not broadcast over police radio.  However, a dispatcher from the Brookings County Sheriff's Office (Brookings County is adjacent to Moody County to the north) broadcast the substance of this second call at 9:29 a.m.  Ex. 2.  The dispatcher stated over the radio that a caller observed a black car at mile marker 127[2] on I-29 traveling northbound and weaving from grassline to grassline, with dark tinted windows, black in color, no plate was noted, no further descriptors, traveling at varying speeds.  Id.

---

visited June 29, 2023).  Some 911 call centers pinpoint a caller's location within 300 yards based on triangulation and trilateration from the cell tower the caller's cell phone is communicating with.  Id.  Some "next generation" 911 call centers use device-based hybrid location technology which locates the caller's phone within 15 meters.  Id.  This detail was not addressed by the evidence presented.

[2] Again, the 911 caller is not heard giving a mile marker number in the call answered by Brookings County dispatch.

Trooper Spielman heard this broadcast over law enforcement radio and responded, also over the radio, that this may be the same car on which a previous report had been made in Moody County.  Ex. 4.  Trooper Spielman stated Moody County had received a report of a black vehicle, which might have been a Volvo, at mile marker 108 traveling north on I-29.  Dispatch responded that the anonymous reporter simply said it was a black car with black tinted windows and no other descriptors.  Trooper Spielman testified that when two independent reports are received on erratic driving about the same vehicle, that indicates the reports represent legitimate complaints.

During these broadcasts, Trooper Mitchell Lang was on stationary patrol, parked in a median on I-29 near the Brookings exit at mile marker 132 listening to the radio reports made by the Brookings County dispatch and by Trooper Spielman.  At 9:33 a.m., Trooper Lang broadcast on the radio that he observed a black Volvo with California license plates traveling north on I-29. Trooper Lang tried to follow the Volvo, but the Volvo took the Brookings exit off of I-29 at mile marker 132.  Ex. 5.  He indicated he was going to follow the car as it left the interstate.  Id.  Trooper Lang testified he believed the driver of the Volvo saw him make movements to follow the car and exited I-29 in an attempt to evade Trooper Lang.

At 9:36 a.m. Trooper Lang radioed that the black Volvo he was following had pulled into the nearby Cenex gas station.  Ex. 6.  He verified the California plates on the vehicle.  Id.  Trooper Lang pulled around the back of the Cenex building and into the parking lot, but he did not initially get out of his patrol

4

vehicle or approach the Volvo.  Neither his lights nor his sirens were activated.
Trooper Lang observed the driver exit the Volvo, enter the Cenex building, and
then come back out again.

Brookings Police Officer Seth Bonnema was on duty with his K-9, Gina,
on the morning of September 25, 2023.  Gina and Officer Bonnema undergo
annual certification tests.  Gina was last certified prior to the events in this
case on June 23, 2022.  Gina is trained to detect the odors of marijuana,
methamphetamine, cocaine, MDMA, psilocybin mushrooms, and heroin.  When
Gina detects the odor of one of these drugs, she indicates by sitting, standing
or lying down.  Officer Bonnema testified that I-29 is a common corridor for
transporting illegal drugs.

Officer Bonnema heard over police radio that morning the information
broadcast by the Brookings County dispatcher, Trooper Spielman, and
Trooper Lang.  Specifically, Officer Bonnema heard that a black "car" with dark
tinted windows was seen driving northbound on I-29 near mile marker 127
weaving from grassline to grassline, he heard from Trooper Spielman report
that a similar complaint had earlier been lodged against a black Volvo vehicle
traveling northbound on I-29 near mile marker 108, that Trooper Lang had
spotted a black Volvo with California license plates traveling north on I-29 near
mile marker 132, and that that Volvo had exited the interstate and was
currently at the nearby Cenex gas station.  When Officer Bonnema heard
Trooper Lang announce that the suspect car was at the Cenex station, he
traveled to that location.

By the time Officer Bonnema arrived at the Cenex station just before 9:37 a.m., the driver had already exited the convenience store and was headed back toward the Volvo.  Officer Bonnema was in uniform with a firearm in its holster on his hip.  He was driving a marked patrol car, which he parked approximately 2 to 2 ½ car lengths behind the black Volvo.  Neither the lights nor siren on his patrol vehicle were activated.  Video from Officer Bonnema's body camera shows that there is a vast expanse of open pavement in front of the Volvo which would have allowed easy egress for the Volvo to depart the parking lot.  See Ex. 8, clip 1 at 9:37:55 a.m.

Officer Bonnema exited his patrol car and met the driver, Mr. Gonzalez, near the front of the Volvo.  Id.  When Trooper Lang saw Officer Bonnema get out of his vehicle, Trooper Lang drove his vehicle over to Officer Bonnema's vehicle and parked behind it.  Trooper Lang also exited his vehicle and approached the passenger from the Volvo who was standing at the back of the Volvo.  Trooper Lang testified that in his estimation, the passenger was "pretending" to pump gas, which aroused Trooper Lang's suspicions. Trooper Lang testified the gas nozzle was inserted into the Volvo's gas receptacle, but the gas pump was not activated, gas was not flowing into the Volvo, and the passenger never did pump gas.  Trooper Lang engaged the passenger, identified as Mr. Marquez, in conversation, but he did not have his body cam activated and he did not remember at the time of the hearing what the two of them discussed.

Officer Bonnema approached Mr. Gonzalez and greeted him by saying "Hello.  How are you guys today?"  Id.  Mr. Gonzalez responded "good, good." Officer Bonnema asked, "Can I talk to you?"  Id.   Mr. Gonzalez responded "yeah."  Id.

Officer Bonnema stated, "Okay, well the reason why I'm stopping you, er, want to talk with you is some anonymous person called out on the interstate that you were all over the road."  Id.

Mr. Gonzalez replied, "I might have been.  I'm tired.  I'll get some rest." Id.  Trooper Lang, overhearing this admission of possibly erratic driving, found his suspicions further heightened.  Officer Bonnema stated, "Okay.  Is it all right if I check your ID?"  Id. at 9:38:16.  While Mr. Gonzalez was retrieving his identification from his wallet, Officer Bonnema asked, "Where you coming from?"  Id.  Mr. Gonzalez replied, "California."  Id.

Officer Bonnema asked "Oh.  What for?"  Mr. Gonzalez responded they were going to the Iowa State Fair.  Officer Bonnema said, "Iowa State Fair?" Mr. Gonzalez said, "yeah."  Officer Bonnema said, "You're past Iowa." Mr. Gonzalez said, "no."  Officer Bonnema asked, "Huh?"  The location of the parties was indeed approximately 75 to 80 miles north of the northern border of Iowa and Mr. Gonzales had been driving still further north.

Mr. Gonzalez then changed his response and said, "You're right, I am. We're going *down* [to Iowa]" motioning with his hand.  Id. at 9:38:31. Officer Bonnema said, "Well you were going north on the interstate.  Iowa's an hour and a half south of here."  Id. at 9:38:36.  Mr. Gonzalez did not respond to

7

this statement but handed over his California driver's license to Officer Bonnema.  Id. at 9:38:49.  Officer Bonnema testified his conversation with Mr. Gonzalez aroused his suspicions:  Mr. Gonzalez was driving the wrong direction to arrive in Iowa, it was the wrong time of year, and Mr. Gonzalez seemed confused as to his current location.

This conversation took place with Officer Bonnema standing in front of the grill of the Volvo approximately at the mid-point of the hood and Mr. Gonzalez standing next to the front passenger fender on the Volvo. Nothing blocked Mr. Gonzalez's path of movement to his right.  To his left, the passenger, Mr. Marquez, can be seen standing near the rear passenger quarter panel with Trooper Lang standing nearby.  Id.

Officer Bonnema asked Mr. Gonzalez *when* the state fair was. Mr. Gonzalez did not answer the question of when the fair was, but stated it was in Des Moines.[3]  Id. at 9:38:56.  Officer Bonnema persisted in asking *when* the fair started.  Mr. Gonzalez replied it was going to start next week.  Id. at 9:38:58.  Officer Bonnema asked why he was going so early.  Mr. Gonzalez stated he needed to set up a pizza wagon for Leeman's Pizzaria, a concessionaire based out of Arlington, Texas.

Officer Bonnema returned to his patrol vehicle with Mr. Gonzalez's driver's license.  He entered information on a laptop or other computer device with a keypad and a screen.  Officer Bonnema testified that he checked

---

[3] Des Moines is 336 miles south of Brookings.  Thus, at the Cenex station, Mr. Gonzalez would have been nearly five hours north of his stated destination, heading further north.

Mr. Gonzalez's driver's license, which was fine, but he also checked the Iowa State Fair website and discovered the fair had already occurred and was over. He ran a check on the Volvo and discovered that this same vehicle had been eastbound on I-80 west of Reno, Nevada, at 11:30 p.m. on September 23, 2022, only two days before. Officer Bonnema believed this showed that Mr. Gonzalez took I-80 to travel east across the country, in which case if his destination had been Des Moines, Iowa, he would have nearly landed right in Des Moines if he had stayed on I-80. This further roused Officer Bonnema's suspicions.

At some point while Officer Bonnema was in his patrol vehicle running checks on Mr. Gonzalez, Trooper Lang asked Mr. Gonzalez to come to his patrol vehicle and take a seat in the front passenger seat. Trooper Lang ran checks on Mr. Gonzalez's driver's license, the passenger's identification card, and the Volvo. Due to the complaints of erratic driving, Trooper Lang began asking Mr. Gonzalez questions to determine whether he was driving impaired.

At 9:44:16 Officer Bonnema exited his patrol vehicle again. Id. Neither Trooper Lang nor Mr. Gonzalez are visible on Ex. 8, but Trooper Lang testified when he saw Officer Bonnema get out of his vehicle, Trooper Lang followed suit.

Officer Bonnema approached the passenger side of the Volvo and asked the passenger, Mr. Marquez (who was seated inside now), if Trooper Lang had obtained his ID. Mr. Marquez indicated he had. Officer Bonnema then asked the passenger where they were traveling to. Id. at 9:44:27. Mr. Marquez told Officer Bonnema that they were heading to the Iowa State Fair, but they were

9

first traveling to White Bear Lake, north of St. Paul, Minnesota, where their boss was located and then afterward on to the Iowa State Fair.  Id. at 9:44:55. But Officer Bonnema told the passenger the Iowa State Fair had already occurred August 11-21.  Id. at 9:45:03.  The passenger made several other remarks.  Officer Bonnema testified he believed the two men were using the Iowa State Fair as a cover story to obscure some kind of illegal activity.

Officer Bonnema asked the passenger whether they had anything illegal in the car.  Id. at 9:45:34.  The passenger said "no" and stated the Volvo belonged to Mr. Gonzalez.  Id.  During this conversation Officer Bonnema continued to hold Mr. Gonzalez's driver's license in his hand.  Officer Bonnema told the passenger he found their story strange and told the passenger that I-29 is a common corridor for the transportation of narcotics.

The passenger asked if he could exit the Volvo.  Officer Bonnema told him he could, that he was not under arrest or being detained.  The gas flap on the Volvo was still open at this point in the video.  Id. at 9:46:26.  The passenger got out of the car and Officer Bonnema asked if he could pat him down.  The passenger objected to being patted down.  Officer Bonnema asked the passenger to remove his hands from his pockets.  The passenger argued he didn't have anything on him but removed a knife from his pocket. Officer Bonnema said since Trooper Lang had the passenger's ID, he wanted to check with Trooper Lang.  The passenger said he just wanted to visit the bathroom in the Cenex station.

10

At 9:47:16 Trooper Lang approached the rear of the Volvo from where his patrol vehicle had been parked behind Officer Bonnema's service vehicle. Id. Trooper Lang and Officer Bonnema spoke near Officer Bonnema's patrol vehicle and Officer Bonnema related what Mr. Gonzalez told him and the fact that the Iowa State Fair had concluded a month prior. In the background, the passenger screwed on the gas cap on the Volvo and closed the gas flap. Id. at 9:47:59. Officer Bonnema then told Trooper Lang that the passenger told him they were going to the Twin Cities. The passenger interjected, "we haven't [gone yet]. I'm gonna have him drop me off [in the Twin Cities]. Don't twist up the stories." Id. at 9:48:15.

At this point, Officer Bonnema got his K-9 Gina out of the back of his patrol vehicle. Id. at 9:48:49. Gina ran up and down the length of the car three times on the driver's side before stopping and sitting erect while looking at/facing the seam of the rearmost portion of the driver's door. Id. at 9:49:08. Officer Bonnema testified that this was Gina's indication that she detected the odor of one of the narcotics she is trained to detect. The Volvo was searched, drugs were discovered[4], and Mr. Gonzalez was arrested.

When Trooper Lang radioed that he had located the suspect Volvo at the Cenex station, Trooper Spielman went to that location to be on stand-by in the event he was needed. He did not participate in the questioning of any of the

---

[4] Thirty-two (32) pounds of methamphetamine were found in the Volvo along with $5,100 in currency, 3 to 4 cell phones, syringes, jewelers bags containing small amounts of methamphetamine, a soda can with the bottom cut off with burn marks and a cotton ball, and a digital scale.

occupants of the Volvo, the search of the Volvo, or of the arrest of

Mr. Gonzalez.  After the search, at 10:29, Trooper Speilman asked

Officer Bonnema if he wanted Moody County dispatch to relay the information

they received to Brookings County.  Officer Bonnema assented to

this suggestion.

At 10:30 a.m. Moody County dispatch relayed to Brookings County

dispatch the details of the 911 call from Mr. Broken Leg along with Mr. Broken

Leg's phone number.  Ex. 7.  This information was relayed between the two

dispatchers *after* Mr. Gonzalez had already been arrested.

Both Trooper Lang and Officer Bonnema agreed that the records checks

on Mr. Gonzalez, his passenger, and the Volvo were "fine."  All the officers who

testified agreed that none of them had made any first-hand observations of

erratic driving or traffic violations by the Volvo.

Mr. Gonzalez makes three arguments in support of suppression of

evidence:  (1) the initial Terry stop was not supported by reasonable suspicion,

(2) the duration of the stop violated Mr. Gonzalez's Fourth Amendment right to

be free from unreasonable searches and seizures, and (3) the search of

Mr. Gonzalez's vehicle must be suppressed as fruit of one or both of the prior

Fourth Amendment violations.  Docket No. 36.

The government resists all three grounds for suppression.  Docket

No. 42.  Specifically the government argues that (1) the initial encounter

between Mr. Gonzalez and police was consensual and did not implicate the

Fourth Amendment; (2) even if the initial encounter was not consensual, the

12

two independent tips provided sufficient detail to lend veracity to the tips,

giving the officers reasonable suspicion to approach the defendant; (3) officers'

discussions with Mr. Gonzalez and his passenger gave rise to reasonable

suspicion to prolong the encounter and submit the vehicle to a drug dog sniff;

and (4) suppression based on fruit of the poisonous tree is inapplicable here as

there was no prior Fourth Amendment violation.

<strong>DISCUSSION</strong>

**A.    Whether the Traffic Stop was Unconstitutional.**

The first issue raised by Mr. Gonzalez is whether the traffic stop was

unconstitutional.  Docket No. 36 at pp. 5-11.  Mr. Gonzalez argues that the

information known to Officer Bonnema was insufficient to give rise to

reasonable suspicion to believe criminal activity was afoot.  Id.  The

government responds that the initial encounter was consensual and, even if it

was not, the two independent citizen tips gave the officers

reasonable suspicion.

The Fourth Amendment to the United States Constitution guarantees

"[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures."  U.S. Const. amend.  IV.

Fourth Amendment protections extend to persons in their automobiles.

Delaware v. Prouse, 440 U.S. 648, 663 (1979) (citing Adams v. Williams, 407

U.S. 143, 146 (1972)).  A traffic stop constitutes a seizure within the meaning

of the Fourth Amendment.  United States v. Martinez, 358 F.3d 1005, 1009

13

(8th Cir. 2004).  But a consensual encounter between police and a suspect is not a seizure and does not implicate the Fourth Amendment.

### 1.    Consensual Encounter

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable persons would feel free 'to disregard the police and go about his business,' the encounter is consensual and no suspicion is required.  The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature."  Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).  Officers may approach individuals and ask them questions and ask for their identification "as long as the police do not convey a message that compliance with their requests is required."  United States v. Lillich, 6 F.4th 869, 875 (8th Cir. 2021) (quoting Bostick, 501 U.S. at 434-35).

A "seizure" occurs when police "by means of physical force or show of authority" restrains a suspect's liberty to such a degree that a reasonable person in the suspect's position would believe "that he was not at liberty to ignore the police presence and go about his business."  Bostick, 501 U.S. at 434, 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  The restriction of liberty must stem from the conduct of the police, not from some independent source such as sitting within the confines of a bus.  Lillich, 6 F.4th at 875.  Determining whether a seizure has taken place requires examination of all the circumstances attending the encounter to determine "whether the police conduct would have communicated to a reasonable person

that the person was not free to decline the officers' requests or otherwise terminate the encounter." Id. at 439; Lillich, 6 F.4th at 876 (courts consider the totality of circumstances in determining if an encounter with police is consensual or a seizure).

Certain factors recur in seizure analysis such as "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." Id. at 876 (quoting United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008)).

The encounter with Mr. Gonzalez ended in his arrest, so the encounter he had with police does trigger Fourth Amendment scrutiny at some point along the continuum of that encounter. The question is at what point during the encounter was the Fourth Amendment implicated and, when it was implicated, did the officers have reasonable suspicion or probable cause in support of their actions?

As the Mr. Gonzalez sets forth in its brief, there is a hierarchy of police encounters. Encounters with police can be consensual, in which case no suspicion is required; they can take the form of a Terry stop, in which case reasonable suspicion is required; or they can take the form of an arrest, in which case probable cause is required.

There are varying factual scenarios addressed by existing case law in this circuit regarding consensual encounters. Where three officers in patrol cars approached a suspect washing his parked car, but the officers did not activate their lights or sirens, did not physically touch the suspect, did not brandish their weapons, did not threaten arrest, and left open avenues of egress, no seizure occurred. Lillich, 6 F.4th at 877. Likewise, where an officer approached a car parked late at night in an alley behind a shopping mall, no seizure occurred. United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005). The officer shined his flashlight on his uniform and kept a hand on his holstered gun, then knocked on the passenger side window. Id. Seizure in that case did not occur until the officer ordered the occupants out of the vehicle (after the officer smelled marijuana). Id.

Merely retaining a suspect's identification, even for up to fifteen minutes, does not constitute a seizure, especially where the suspect does not request the return of his identification and, when he asks if he is free to leave, is told that he is free. Oglesby v. Lesan, 929 F.3d 526, 533 (8th Cir. 2019). See also Lillich, 6 F.4th at 876 (seven-minute retention of identification did not constitute a seizure).

Where an officer asked a suspect to exit his car, produce identification, and have a seat in the officer's patrol car while the officer conducted a records check, the Eighth Circuit held no seizure occurred. United States v. Vera, 457 F.3d 831, 836 (8th Cir. 2006). Similarly, when a lone officer did not activate her lights or siren, did not brandish a firearm, did not make physical contact

16

with the suspect, did not block the suspect's departure, did not threaten arrest, or tell the suspect he was the focus of an investigation, but only asked for identification and conducted a records check, no seizure was held to have occurred.  Oglesby, 929 F.3d at 533.

Here, the initial encounter was consensual, but only for a few minutes. There were only two law enforcement vehicles parked well behind Mr. Gonzalez's car, allowing ample room for Mr. Gonzalez to drive away.  No lights or sirens were activated.  The voices of the officers were conversational and friendly.  No commands or orders were given.  No voices were raised.  The officers had weapons on their hips, but they did not touch them or unholster them.  And Officer Bonnema asked if it was okay to talk to Mr. Gonzalez, who readily agreed.  During this phase of the encounter, the Volvo was not blocked in—it had a clear path of egress in front of it.  Neither was Mr. Gonzalez trapped—he stood at the right front corner of the Volvo, Officer Bonnema stood in the center of the front of the Volvo, leaving and expanse to Mr. Gonzalez's right from which he had a clear path of movement.

However, very quickly, approximately two minutes into the encounter, Officer Bonnema announced to Mr. Gonzalez that he was the subject of an investigation for erratic driving and Mr. Gonzalez admitted he had probably driven badly due to fatigue.  A short two minutes later, Officer Bonnema had asked for and received Mr. Gonzalez's driver's license.  Shortly after receiving the license, Officer Bonnema took it with him back to his patrol vehicle to run records checks.

At this point, a reasonable person in Mr. Gonzalez's position would have believed he was not free to leave.  He knew a complaint had been given regarding his erratic driving, he had admitted he probably drove erratically, and he did not have possession of his driver's license.  Knowing one is a target of an investigation for impaired driving would lead most people to believe they are not going to be free to go until at the very least their sobriety has been assessed in some form through either roadside tests, a PBT, or some other measure.  The consensual nature of this encounter ended when Officer Bonnema took Mr. Gonzalez's driver's license and retreated to his patrol car.

### 2.    Reasonable Suspicion

As an alternative ground, the court addresses whether the officers had reasonable suspicion for the initial encounter.  Reasonable suspicion must be assessed at two points in time.  First, in the event a reviewing court does not agree that the encounter with police was initially consensual, the court must address whether police had enough information to justify approaching the Volvo and engaging its occupants in conversation.  Second, the court must determine whether there was reasonable suspicion to justify the duration of the encounter until the K-9 Gina indicated to the presence of drugs in the Volvo.

### a.    The Standard

"[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest."  Rodriguez v. United States, 575 U.S. 348, 354 (2015) (citing Knowles v. Iowa, 525 U.S. 113, 117

(1998); <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)).  A <u>Terry</u> stop must be supported by reasonable suspicion or probable cause.  <u>Terry</u>, 392 U.S. at 21-22, 27; <u>United States v. Holly</u>, 983 F.3d 361, 364 (8th Cir. 2020) ("Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.")

An officer making a <u>Terry</u> stop based on reasonable suspicion, must be able to articulate something more than an "incohate and unparticularized suspicion or hunch." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).  Officers must have "a particularized and objective basis for suspecting the particular person of criminal activity." <u>Navarette v. California</u>, 572 U.S. 393, 396 (2014). Reasonable suspicion in support of a <u>Terry</u> stop "is dependent upon both the content of information possessed by police and its degree of reliability." <u>Id.</u> (quoting <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990)).

In evaluating the standard, courts must consider the totality of the circumstances.  <u>Id.</u>  "[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." <u>United States v. Herrera-Gonzales</u>, 474 F.3d 1105, 1109 (8th Cir. 2007);  <u>see also</u> <u>United States v. Andrews</u>, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

A traffic stop need not be based on the police officer's personal observation—it can be based on information supplied by a third party. Navarette, 572 U.S. at 397.  Even a single anonymous tip may provide the necessary reasonable suspicion if the indicia of reliability are sufficient—such as richness of detail, eyewitness observation, use of the 911 system to report the tip, and an absence of any reason to suspect the tipster had a motive to fabricate.  Id.  An anonymous tip whose details are corroborated by police may also make the tip sufficiently reliable to create reasonable suspicion.  Id. at 398.  Although a traffic violation can provide the basis for a Terry stop, there is no requirement that a traffic violation occur if there are other grounds providing the officer with a reasonable, articulable suspicion of criminal activity.  United States v. Jacobsen, 391 F.3d 904, 907 (8th Cir. 2004) (quoting United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001)).

### b.    The Initial Encounter with the Volvo's Occupants

Where a traffic stop is based on an anonymous tip, the tip must "be 'suitably corroborated' and exhibit 'sufficient indicia of reliability' " in order to rise to the level of reasonable suspicion.  Parker v. Chard, 777 F.3d 977, 980-81 (8th Cir. 2015) (quoting Florida v. J.L., 529 U.S. 266, 270 (2000)).  In Alabama v. White, 496 U.S. 325, 330 (1990), police received an anonymous tip that a named person would leave an identified apartment at a specific time and transport cocaine in a brown Plymouth station wagon with a broken taillight to a named motel.  Police were able to visually corroborate most aspects of the tip such as the suspect's sex, the departure time, the vehicle, and her destination.

20

Id. at 332.  The Court held the tip, along with its subsequent corroboration, gave rise to reasonable suspicion for a Terry stop.  Id.

A tip alleging a traffic violation must "contain sufficient quantity of information to support an inference that the tipster has witnessed an actual traffic violation."  United States v. Wheat, 278 F.3d 722, 732 (8th Cir. 2001). The time interval between the police receiving the tip and locating the vehicle may also bear on the reliability of the tip.  Id. at 731.  There is a less rigorous standard for corroboration of tips alleging erratic driving because such driving presents an imminent present danger.  Id. at 732 n.8.  A tip on a moving violation "must suggest real exigency.  An allegation of erratic driving will generally pass this test since it strongly suggests that the driver is operating under the influence of alcohol or drugs and is unable to control his vehicle." Id.  "[T]he more extensive the description of the alleged offense, the greater the likelihood that the tip will give rise to reasonable suspicion."  Id.

In the Wheat case, the tip contained the make and color of the vehicle, named the first three letters of its license plate, and gave the vehicle's location and direction.  Id. at 732.  The court held these details were sufficient to make the tip reliable and provide the officers with reasonable suspicion to conduct a traffic stop without first-hand observation of any traffic violations.  Id.  The tip must, however, include more than just the location and appearance of the vehicle.  Id. at 733.  The tip must "be reliable in its assertion of illegality," not just identity.  Id.  The cornerstone of a tip's reliability is the basis of the

tipster's knowledge and crimes committed in the open witnesses firsthand by the tipster are at the higher end of the reliability spectrum.  Id. at 734.

Here, the court must specify what information was—and what was not—known to Officer Bonnema and Trooper Lang when they made the decision to approach the Volvo's occupants.  The officers did *not* hear either of the 911 calls that were made.  Therefore, Exs. A and B must be set aside and not considered.  Those calls were never heard by these officers.

What the officers *did* know was the following:

--at some unidentified earlier time on the morning of September 25, Moody County received a report of:

> --erratic driving
> --by a black "vehicle"
> --possibly a Volvo
> --driving north
> --on I-29
> --observed at mile marker 108[5]

--at 9:29 am September 25, Brookings County dispatch reported:

> --a black *car*
> --with dark tinted windows
> --driving north
> --on I-29
> --observed at mile marker 127
> --weaving from grassline to grassline
> --traveling at varying speeds[6]

--at 9:33 a.m. September 25, Trooper Lang reported:

> --a black Volvo
> --with California license plates

---

[5] See Ex. 4 (Trooper Speilman's broadcast summarizing of Moody County 911 call).

[6] See Ex. 2 (Brookings County dispatch broadcast summarizing 911 call).

    --traveling north
    --on I-29
    --observed at mile marker 132[7]

Mr. Gonzalez emphasizes the details regarding the *appearance* of the car in these reports and argues that there is insufficient evidence to constitute reasonable suspicion. He points out there was no license plate given in connection with the Moody County or the Brookings County information, the Brookings County report did not specify a Volvo, and that the two reports did not specify that it was a *sedan* that was observed.

The court agrees in part, but there *were* quite a few concrete details regarding the suspect vehicle's appearance that were reported. The Brookings County broadcast specified a "car," which in the vernacular is not usually a word used to connote a pick-up truck or an SUV but is typically used when describing a sedan. Also, the vehicle was consistently described as black in all three reports. One report indicated the vehicle had dark tinted windows. And the Moody County report added the detail that the vehicle was possibly a Volvo. All these details matched Mr. Gonzalez's Volvo.

But details of the *appearance* of the suspect vehicle were not the only identifying information that was available to the officers. In White, the identifying information included not only a description of the physical appearance of the vehicle, but also its movements, which the Court took into consideration as part of the totality of the circumstances. White, 496 U.S. at

---

[7] See Ex. 5 (Trooper Lang's broadcast).

330, 332.  In this case, too, the movement and location of the Volvo were clues to its identity.

Here, the officers had knowledge about the direction of travel of the vehicle—north—and the road the vehicle was traveling on—I-29.  These details, too, matched the direction and location of travel of Mr. Gonzalez's Volvo.

Finally, only 4 minutes separated the Brookings County dispatch broadcast (at 9:29 a.m.—Ex. 2) and Trooper Lang's broadcast (at 9:33 a.m.—Ex. 5), and the difference between the mile markers associated with those two broadcasts was 5 miles (mile marker 127 to mile marker 132).  It is readily apparent that a car traveling 60 miles per hour can travel 5 miles in 5 minutes.  Therefore, a car traveling at slightly more than 60 miles per hour could travel 5 miles in 4 minutes, which are exactly the facts applicable to Mr. Gonzalez's Volvo as the facts unfolded before the officers.

Mr. Gonzalez also focuses on the fact that the Brookings report was anonymous and lacked many details of the car's appearance.  But one doesn't examine one piece of information in isolation.  The court must consider all the information known to the officers at the time.  The Brookings County tip was corroborated in part by the Moody County tip, which were both in turn corroborated by Trooper Lang's observations.  A tip that, by itself, may not be reliable can become so when corroborated by independent observations by others.  Cf. United States v. Fulgham, 143 F.3d 399, 401 (8 th Cir. 1998); United States v. Williams, 10 F.3d 590, 593-94 (8 th Cir. 1993); United States v. Humphreys, 982 F.2d 254, 258-59 (8 th Cir. 1992) (all holding in the context

24

of evaluating whether a search warrant set forth probable cause that information from an informant that is corroborated by other independent informants or by police investigation bolsters the reliability of the informant's tip).

Mr. Gonzalez also argues that any exigency posed by his erratic driving was less important at the time Officer Bonnma approached the Volvo because the Volvo was parked at the time. The court rejects this argument. The Volvo was parked in a location--in front of a gas pump--where it would be permitted to remain only very temporarily. That means that Mr. Gonzalez—absent police intervention—would have to get behind the wheel of the Volvo and begin driving again very shortly. Nor was this a case where the erratic driving was something minor such as momentarily having one tire drift over the center lane. The tips indicated that Mr. Gonzalez was veering from grass line to grass line over a considerable stretch of I-29 over a considerable period of time. The court believes the tips in this case raised exactly the kinds of exigency addressed in footnote 8 of the <u>Wheat</u> opinion.

This court concludes, considering the totality of information available to Officer Bonnema and Trooper Lang, that the facts known to them prior to making contact with the Volvo's occupants gave them reasonable suspicion to approach the Volvo even if the encounter was not consensual from its inception.

### c.    Whether the Duration of the Traffic Stop Was Unconstitutional.

Mr. Gonzalez also argues the police unconstitutionally prolonged the duration of the traffic stop beyond what was necessary to investigate the report of erratic driving.  Docket No. 36 at pp. 11-14.  The government argues upon visiting with the occupants of the Volvo, the officers had additional reasonable suspicion to continue to detain those occupants while they explored their suspicions.

The Supreme Court outlined the law applicable to the duration of traffic stops:  a constitutionally permissible traffic stop (one supported by probable cause or reasonable suspicion), can violate the Fourth Amendment when its length exceeds the time needed to attend to the stop's mission and related safety concerns.  Rodriguez, 575 U.S. at 354.  A traffic stop may be continued until the "tasks tied to the traffic infraction are—or reasonably should have been—completed."  Id.  However, when "complications arise" in addressing the initial reasons for the traffic stop, the Fourth Amendment permits police to detain the driver "for a longer duration" than would be "strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

In Peralez, an officer found nothing "unusual or out of place" with the driver's license or vehicle registration; the stop was delayed entirely because of the officer's drug-interdiction questioning.  United States v. Peralez, 526 F.3d 1115, 1120 (8th Cir. 2007).

In Lyons, an officer prolonged a stop for a speeding violation after learning of the driver's unusual itinerary, observing a large amount of luggage,

and receiving conflicting stories from the driver and passenger. <u>Lyons</u>, 486 F.3d at 372. The officer who was trained in highway drug interdiction extended the stop for the arrival of a drug dog which took 25 minutes to arrive. <u>Id.</u> The Eighth Circuit found that the officer had developed reasonable suspicion that criminal activity was occurring—specifically that there was contraband in the vehicle. <u>Id.</u> That articulable reasonable suspicion justified prolonging of the stop. <u>Id.</u> (Officers were not dilatory in their investigation and there was no evidence of unnecessary delay.)

Here, Officer Bonnema learned within the first two minutes of encountering the Volvo's occupants the following additional information separate and apart from the facts giving rise to reasonable suspicion for the initial encounter: Mr. Gonzalez was ostensibly traveling to the Iowa State Fair in Des Moines, Iowa; that he was already 4.5 hours north of his target destination and heading still further north; confirmation that Mr. Gonzalez had indeed been driving erratically; and that he was traveling a road that is used as a corridor for drug traffic. These facts gave rise to reasonable suspicion. At the very least, they justified Officer Bonnema checking Mr. Gonzalez's driver's license, checking the Volvo's information, and assessing whether Mr. Gonzalez was driving impaired.

While conducting these routine checks, Officer Bonnema learned two pieces of additional information: that the Iowa State Fair had already been held a month prior, and that the same Volvo had been traveling east late at night two days prior outside of Reno, Nevada, on I-80, a route that (had Mr.

27

Gonzalez stayed on it) would have taken Mr. Gonzalez almost directly to Des Moines, Iowa, his professed destination. This gave rise to further reasonable suspicion, justifying Officer Bonnema in checking with the passenger of the Volvo to see what his story was.

Upon speaking to the passenger, Officer Bonnema learned additional facts that conflicted with what Mr. Gonzalez stated: that the two were driving to White Bear Lake, Minnesota, and that that location was the owner of Leeman's Pizza's headquarters. Mr. Gonzalez never indicated the two were traveling to Minnesota and he had previously told Officer Bonnema Leeman's Pizza was based out of Arlington, Texas.

Trooper Lang overheard Mr. Gonzalez tell Officer Bonnema that he was traveling to the Iowa State Fair, but otherwise did not hear much of the conversation between Officer Bonnema and Mr. Gonzalez. What Trooper Lang did observe was that the passenger was, in his words, pretending to pump gas in the Volvo. Trooper Lang drew this inference because the passenger had removed the gas nozzle and inserted it into the gas receptacle hole on the Volvo, but he had not activated the pump, no gas was flowing, and he never did pump gas. Trooper Lang also believed the Volvo had exited at Exit 132 after seeing Trooper Lang's patrol vehicle and that the occupants of the Volvo were attempting to evade Trooper Lang.

Mr. Gonzalez attempts to refute the bases of Trooper Lang's suspicions by arguing it is possible that Mr. Gonzalez went inside the Cenex station to pay for gas in advance rather than paying with a credit card at the pump, which

28

would explain why the passenger was in readiness to pump gas, but wasn't pumping any gas while Trooper Lang stood there.  Perhaps, but Mr. Gonzalez returned from inside the Cenex station before Trooper Lang approached the passenger.  If the events were as Mr. Gonzalez suggests, the passenger would have started pumping gas upon Mr. Gonzalez's return or shortly thereafter.  He never did.

Mr. Gonzalez also suggests perhaps the occupants of the Volvo never saw Trooper Lang's patrol vehicle sitting in the median of I-29 and that they took Exit 132 for innocent reasons.  This is entirely possible and Trooper Lang, on cross-examination, did not deny the possibility.  But a long line of cases makes clear that activity sufficient to give rise to reasonable suspicion need not be criminal activity.

In United States v. Perkins, 363 F.3d 317, 326-327 (4th Cir. 2004), there was an informer's tip as to open gun possession, an activity that was *legal* in West Virginia.  The defendant argued that his Fourth Amendment rights were violated because the tip did not report illegal activity, only legal activity.  The court rejected this argument.  The court drew a distinction between the reasonable suspicion standard required in Terry and the probable cause standard applicable in other contexts.  Under the probable cause standard, the question is whether the officer had a reasonable basis for believing that a suspect "had committed or was committing an offense."  In other words, criminal activity must have already occurred or be occurring.  The reasonable suspicion standard asks whether the officer reasonably believes that "criminal

activity may be afoot." The difference, the court explained, was between past or present illegalities (probable cause) and an officer's ability to prevent future wrongdoing (reasonable suspicion), which is at the heart of Terry.

The Perkins court noted that in Terry itself, the actions of the defendants which the officers observed were legal--they were pacing back and forth and talking to each other outside of a store. Perkins, 363 F.2d 327 (citing Terry, 392 U.S. at 22-23). Here the tip from the known informer was that two men were pointing rifles in various directions in the front yard of a duplex well known for drug activity in a high crime and drug trafficking area. Perkins, 363 F.3d at 327. It is not illegal to openly carry a firearm under West Virginia law, and sportsmen routinely display hunting and sporting rifles. Id. However, the context of the tip was important: here, the activity was taking place outside of a known drug house in the middle of a residential, high-crime, drug-ridden neighborhood. Id. This type of activity in this setting, "would give any officer a commonsensical reason to be suspicious." Id. The court concluded that reasonable suspicion existed because the reported behavior, while legal, rightfully aroused the officer's suspicion warranting an investigatory stop.

Although the Perkins decision is not controlling authority in this jurisdiction, it is in accord with Supreme Court precedent, which is controlling. See Illinois v. Wardlow, 528 U.S. 119 (2000). In Wardlow, police officers were patrolling an area where heavy drug trafficking occurred. Wardlow, 528 U.S. at 121. Upon seeing the officers, Wardlaw fled. Id. The officers caught up with him, stopped him, and patted him down, discovering a .38-caliber handgun.

Id.  The Court held that the search of Wardlow under these circumstances did not violate the Fourth Amendment.  Id.

The Court stated that a person's presence in "an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that a person is committing a crime." Id. at 124 (citing Brown v. Texas, 442 U.S. 47 (1979)).  But the fact that the stop occurred in a high crime area is relevant to the reasonable suspicion inquiry.  Id.  Here, the officers' suspicion was also supported by Waldron's unprovoked flight.  Id. at 124-125.  The Waldron decision did not involve a tip, as Perkins did, but the activity of Waldron in that case, like the activity of Perkins and Terry, was legal activity.  Given the context, however, each court found the legal activity of each defendant to nonetheless give rise to reasonable suspicion supporting the officers' stops.  See also 4 Wayne R. LaFave, Search & Seizure §9.5(h), 571 (2004) (stating that the central issue of cases involving tips in the context of Terry stops "is whether the informant's information is so reliable and complete that it makes past, present *or pending* criminal conduct sufficiently likely to justify a stopping of the designated person for investigation.") (emphasis supplied).

In United States v. Watts, 7 F.3d 122 (8th Cir. 1993), a citizen called law enforcement and reported several suspicious men loading what appeared to be long guns into a blue van.  Id. at 123-124.  Police pulled Watts' blue van over, checked Watts' driver's license, and told Watts and his passenger that they had been pulled over because of a report of property being loaded into a van.  Id.

31

Watts and his passenger gave conflicting answers when asked if there were any guns in the van.  Id.  Law enforcement then searched the van, found three guns, and wrote down the serial numbers on the guns.  Id.  The alleged owner of the guns denied knowing Watts or his passenger and Watts was then arrested for being a felon in possession of a firearm.  Id. at 124.

Watts argued that the stop of his van violated the Fourth Amendment. Id.  The Eighth Circuit noted that a Terry stop can be supported by suspicious activity that does not conclusively prove guilt.  Id. at 125 (citing United States v. Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988)). Conduct that is consistent with both guilt and innocence may nevertheless support a reasonable suspicion justifying a Terry stop.  Id.

This court must consider the totality of circumstances in determining the legality of the duration of the seizure of the Volvo and its occupants. Mr. Gonzalez was suspected of driving erratically, a suspicion he essentially confirmed when asked.  This alone would have allowed the officers enough time to ascertain whether Mr. Gonzalez was driving impaired, a process Trooper Lang embarked upon immediately after checking Mr. Gonzalez's driver's license and that of his passenger.  United States v. Walker, 555 F.3d 716, 719-20 (8th Cir. 2009) (driver's erratic driving, even if it did not constitute a traffic violation, gave rise to reasonable suspicion for a traffic stop of sufficient duration to investigate whether driver was impaired); United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (erratic driving gave police

reasonable suspicion to conduct a traffic stop and investigate their suspicions of impaired driving).

The officers also knew, either jointly or separately, that the Volvo may have tried to evade police by taking an exit; that the passenger went through the motions of pumping gas but never did so; that both men said they were going to the Iowa State Fair, but were several hundred miles off course heading still further in the wrong direction; that the Iowa State Fair had concluded over a month prior; that they were traveling a corridor known for narcotics transportation; and that each man gave differing accounts of where their ostensible employer, Leeman's Pizza, had its headquarters.

The time between initial encounter (9:36 a.m.) and running the drug dog Gina around the Volvo (9:48 a.m.) was only 12 minutes. The court concludes that the totality of the facts justified the officers in detaining the Volvo and its occupants for the length of time involved here until Gina indicated to the presence of narcotics. Neither officer engaged in delay. Gina was present at the scene from the inception, so there was no wait time for her to arrive. The officers briskly investigated the facts presented to them. Twelve minutes' delay to check out the men's stories was reasonable given the facts presented and the actions of the men and the police.

Once Gina indicated to the presence of drugs, the officers had probable cause to search the Volvo. Florida v. Harris, 568 U.S. 237, 246-47 (2013). Mr. Gonzalez does not object to the reliability of Gina as a drug-detecting dog nor does he argue that her indication under the circumstances was not

reliable.  The court notes Gina was deployed within 12 minutes and the entire encounter was over in less than one hour (9:37 a.m. to 10:29 a.m.), including the search and the arrest of Mr. Gonzalez.  Accordingly, this court concludes the duration of this police encounter did not violate Mr. Gonzalez's Fourth Amendment rights.

Mr. Gonzalez writes in his brief that Officer Bonnema admitted that he twisted the stories of the Volvo's occupants.  This is a misreading of the evidence.  Exhibit 8 clearly shows that the *passenger accused* Officer Bonnema of twisting up the stories.  All Officer Bonnema did was repeat what the passenger had said when filling other law enforcement agents in on the events that had transpired.

**B.     Suppression of Statements and Evidence under the Exclusionary Rule.**

Mr. Gonzalez argues that under the exclusionary rule, evidence obtained in violation of the Fourth Amendment should be suppressed.  Docket No. 36 at pp. 14-15 (citing Mapp v. Ohio, 367 U.S. 643, 654 (1961)).  He argues that the discovery of the drugs was a direct result of the Fourth Amendment violations which occurred when the officers made contact with him and unconstitutionally delayed his detention.  He also argues that his post-search statements to police should be suppressed as fruit of the earlier Fourth Amendment violations.[8]  This court has found that the government has met its

---

[8] No such statements or interrogations were referenced at the evidentiary hearing.  Mr. Gonzalez indicates in his brief that, after the search of the Volvo uncovered narcotics, Mr. Gonzalez was later interrogated at the police station.

burden of showing that both the initial encounter and length of the detention were constitutional.  Thus, the fruits of the search of the Volvo and Mr. Gonzalez's post-search statements should not be suppressed because they did not derive from any  Fourth Amendment violation.[9]

**CONCLUSION**

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying in its entirety defendant Jose Rolando Gonzalez's motion to suppress [Docket No. 35].

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the

---

See Docket No. 36 at p. 4.  It is the statements at the police station Mr. Gonzalez seeks to suppress as fruit of the poisonous tree.

[9] Mr. Gonzalez raises no independent argument or grounds for suppressing his statements such as Miranda v. Arizona, 384 U.S. 436 (1966).

district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black,

781 F.2d 665 (8th Cir. 1986).

DATED this 14th day of July, 2023.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge