UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE ROLANDO GONZALEZ, *also known as* Jose Ronaldo Gonzalez,<br><br>Defendant. | 4:22-CR-40119-KES<br><br>ORDER ADOPTING REPORT & RECOMMENDATION AS AMENDED IN PART AND DENYING DEFENDANT'S MOTION TO SUPPRESS |

Defendant, Jose Rolando Gonzalez, is charged with one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Docket 28. Gonzalez moves to suppress all evidence obtained by law enforcement officers during the search of his vehicle on September 25, 2022, and all subsequent statements Gonzalez made to police during that encounter. Docket 35 at 1. Gonzalez argues the officers involved did not have reasonable suspicion to effectuate a *Terry* stop of his car, and even if the stop was lawful, the officers extended it beyond what is permitted under the Fourth Amendment to the United States Constitution. *Id.* Gonzalez contends that the unlawful stop renders the evidence gathered and the subsequent statements he made inadmissible as fruit of the poisonous tree. *Id.* Plaintiff, the United States of America, opposes the motion. Docket 42.

The court referred Gonzalez's motion to Magistrate Judge Veronica Duffy

under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended denying Gonzalez's motion to suppress. Docket 47 at 35; *see also* Docket 46 (evidentiary hearing transcript). Gonzalez filed objections to the Report and Recommendation. Docket 48. After a de novo review of the Amended Report and Recommendation and the entire record, the court adopts the Report and Recommendation as modified below and denies Gonzalez's motion to suppress.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After a de novo review of the transcript of the evidentiary hearing, the parties' documents, and the exhibits received into evidence, the court makes the following factual findings:

On September 25, 2022, at approximately 9:12 a.m., the Moody County dispatch office received a 911 call from Isaiah Broken Leg, who was reportedly traveling northbound on Interstate 29 (I-29) at the "Madison exit" (approximately mile marker 109). Ex. A[1]; *see also* Docket 46 at 8-9 (Spielmannn also stating the complaint occurred around mile marker 109). Broken Leg called to report that there was "either a distracted or a drunk driver" swerving onto the shoulder of the road and into the left lane. Ex. A. Broken Leg stated that the vehicle was traveling northbound and appeared to be "a black Volvo sedan, of some kind." *Id.*

Moody County dispatch personally relayed this report to State Trooper Chris Spielmannn, who was present there at the Flandreau dispatch/sheriff's office at that time. Docket 46 at 14, 21-22. Because Spielmannn had received the information directly, he did not know if Moody County dispatch had broadcast the report over the radio. *Id.* at 22.

Spielmannn left Flandreau around 9:15 a.m., heading towards I-29. *Id.* at 9-10. Once on I-29, Spielmannn encountered approximately four black vehicles, but he did not locate a black Volvo. *See id.* at 10-11, 15. Spielmannn

---

[1] Ex. A is a recording of a 911 call received by Moody County dispatch and was admitted into evidence without objection. *See* Docket 46 at 4, 6-7, 22.

continued to travel north on I-29, slightly above the posted speed-limit, believing that he was likely behind the reported vehicle. *Id.* at 11.

At 9:29 a.m., Spielmannn heard a radio broadcast from Brookings County dispatch relaying information from an anonymous caller traveling northbound on I-29 by the Elkton exit (near mile marker 127). Ex. 2.[2] Dispatch reported that, according to the tip, there was a black car with dark tinted windows near mile marker 127 traveling at varying speeds and weaving "from grass line to grass line." *Id.*

Spielmannn responded to the broadcast at 9:30 a.m., telling dispatch that this was "probably" and "may be the same vehicle" that Moody County had received a complaint about. Ex. 4.[3] Spielmannn explained that the original report had said that a vehicle was northbound from mile marker 108, black, and might have been a Volvo. *Id.* The Brookings County dispatcher responded "10-4, she[, the Brookings County reporting party,] just stated it was a black car; black, dark tinted windows; and didn't have any further descriptors as far as bumper stickers or anything like that." *Id.* This conversation took place over the radio, meaning all of the officers tuned into the frequency, which was the local channel, would have heard it. Docket 46 at 22-23.

While these events occurred, State Trooper Mitchell Lang was on patrol and parked in the median turnout on I-29 just south of Exit 132. Docket 46 at

---

[2] Ex. 2 is a recording of Brookings County dispatch's broadcast, which was admitted into evidence without objection. *See* Docket 4, 16, 36, 66.
[3] Ex. 4 is a recording of Spielmann's broadcast responding to dispatch and was admitted into evidence without objection. *See* Docket 46 at 5-7, 16-17.

25. At the evidentiary hearing, Lang testified that he later heard the Brookings County dispatch broadcast but was not certain that he had heard Spielmannn's response. *Id.* at 25-26, 37. *But see id.* at 27-28 (Lang stating he knew of the Moody County complaint because of Spielmannn, thus implying that he did hear Spielmannn's broadcast). At 9:33 a.m., Lang observed a black Volvo with California license plates (which Lang soon learned was driven by Gonzalez) traveling north on I-29. *Id.* at 26-27, 30. Lang began following Gonzalez, but did not activate his sirens or lights. *See id.* at 29 (Lang explaining that his audio recording system was not on when he initially contacted Gonzalez because he had not activated his lights, which would have started the recording process). *Id.* Gonzalez then took the nearby Exit 132. *Id.* Lang relayed all the above information over a local radio channel to Brookings County dispatch. *Id.* at 27; Ex. 5.[4] Lang testified at the evidentiary hearing that he believed Gonzalez exited off I-29 upon seeing Lang's patrol car pull out behind him. Docket 46 at 26-27.

Lang followed Gonzalez to a Cenex gas station off of I-29. *Id.* at 28, 40. Lang watched Gonzalez park next to a gas pump, immediately exit the vehicle, and walk towards the gas station. *Id.* at 28. Lang pulled around the back of the building and parked. *Id.* At 9:36 a.m., Lang broadcast via radio that the vehicle had pulled into the Cenex. *See id.* at 56-57.

---

[4] Ex. 5 is a recording of Lang's radio broadcast and was admitted into evidence without objection. *See* Docket 46 at 38-39, 69-70.

Brookings Police Officer Seth Bonnema was on patrol that morning with his K-9 and heard the radio broadcast from Brookings County dispatch, Spielmannn, and Lang. *Id.* at 56. Bonnema drove to the Cenex and parked approximately fifteen to twenty feet behind Gonzalez's car. Docket 46 at 28, 55-57. Neither Lang nor Bonnema activated their lights or sirens. *Id.* at 28, 57.

At approximately 9:38 a.m., Bonnema approached Gonzalez, who had returned to the car, and the passenger, and said, "Hello. How are you guys today?" Ex. C[5] at 00:35. Seconds later, Bonnema told Gonzalez, "The reason why I'm stopping, er, the reason I want to talk with you is, some anonymous person called out on the interstate that you were all over the road." *Id.* at 00:40-00:49. Gonzalez admitted that he might have been, he was tired, and that he would get some rest. *Id.* at 00:49-00:51. This led Bonnema to believe that Gonzalez was the driver, and he then asked Gonzalez if it was alright if he checked Gonzalez's ID, at approximately 9:38:12 a.m. *Id.* at 00:54; Docket 46 at 58.

Next, as Gonzalez searched for his ID, Bonnema asked where Gonzalez was coming from and where he was going, to which Gonzalez replied that he was traveling from California to the Iowa State Fair. Ex. C at 1:01. Bonnema, surprised, responded that Gonzalez was past Iowa. *Id.* at 1:08. Gonzalez initially said, "no," but later amended, "I guess maybe I am wrong. I'm going

---

[5] Ex. C is the video recording from Bonnema's body cam footage and was entered into evidence without objection. See Docket 46 at 7. Ex. C and Defendant's Ex. 8 Clip 1 are the same footage, except Ex. C only contains the first twelve minutes of the video.

down," gesturing with his hand to indicate he was driving south to Iowa. *Id.* at 1:08-1:17. Bonnema challenged this, pointing out that Gonzalez had been traveling north on the interstate while Iowa was "an hour and a half south" of their location. *Id.* at 1:18-1:26. Gonzalez, appearing flustered and frustrated, said only "Oh my god," in reply as he continued to search for his ID. *Id.* at 1:26.

Once Gonzalez found his ID, he handed it to Bonnema, who asked when the state fair was being held; Gonzalez responded it was in Des Moines. *Id.* at 1:36-1:38. Having not received an answer to his question, Bonnema again asked when the state fair started. *Id.* at 1:40. Gonzalez said it would start next week. *Id.* at 1:41. When asked why he was going to the fair so early, Gonzalez stated that he and his passenger need to go set up a pizza wagon owned by Leeman's (or Lehman's) Pizzeria, a concessionary, out of Arlington, Texas, and that he worked for Leeman's. *Id.* at 1:44-2:05.

At that time, Bonnema asked once more if it was alright if he checked Gonzalez's ID and after Gonzalez responded affirmatively, Bonnema took the ID to his patrol car. *Id.* at 2:06-2:08. Bonnema later recounted the parts of Gonzalez's story that stood out to him as suspicious: (1) Gonzalez was about an hour and a half hours north of Iowa and was traveling in the wrong direction relative to Gonzalez's destination—the Iowa State Fair in Des Moines, Iowa, (2) Gonzalez seemed confused about his location, and (3) Gonzalez's assertion that the state fair was taking place in late September, instead of in the summer period. Docket 46 at 59; *see also* Ex. C at 1:01-2:08.

7

While Bonnema had been speaking to Gonzalez, Lang had approached the rear passenger-side quarter panel area of Gonzalez's vehicle and engaged the passenger, who appeared to be trying to use the gas pump, in conversation. Ex. C at 00:56; Docket 46 at 29. Lang later testified he believed the passenger was only pretending to try and pump gas. Docket 46 at 30. During this time, Lang overheard parts of Bonnema's conversation with Gonzalez, including Gonzalez's admission that he might have been driving erratically and that he was on his way to the Iowa State Fair. *Id.* at 31.

While Bonnema was in his patrol car, Lang asked Gonzalez if he would come back to Lang's patrol car. *Id.* at 43. Gonzalez agreed. *Id.* Lang later testified that he had asked Gonzalez to come back to his car so he could check Gonzalez for impairment, in light of Gonzalez having admitted to driving erratically. *Id.* at 31-32. In the car, Gonzalez told Lang that their destination was the *Minnesota* State Fair and that they had been driving for about a day and a half. *Id.* at 32.

Meanwhile, in his own patrol vehicle, Bonnema found Gonzalez's license to be valid. *Id.* at 61, 75. He also looked up the Iowa State Fair and discovered it had been held a month previous. *Id.* at 61. Using Gonzalez's license plate, Bonnema learned that two days prior, Gonzalez's vehicle had been traveling eastbound on I-80 west of Reno, Nevada, which passes directly through Des Moines, Iowa. *Id.* at 61-62. Thus, if Gonzalez had stayed on the I-80 route, he would not have arrived in Brookings, South Dakota, which is approximately 3 hours and 14 minutes north of the I-80 route. *Id.*

8

After approximately five minutes, Bonnema exited his vehicle and walked back over to Gonzalez's car where the passenger of the vehicle had sat down in the passenger seat. Ex. C at 2:10-7:08. Bonnema asked the passenger if Lang took his ID, which he indicated Lang did. *Id.* at 7:09 (audio quality and volume makes the passenger's exact response difficult to understand). Bonnema asked the passenger where they were headed, and the passenger said they were going "to a state fair in Iowa to work a concessions booth for Lehman's Pizzeria but that they were currently en route to Minnesota, the Twin Cities, specifically White Bear Lake, to meet up with the boss's crew and then we're going to travel back down to the state fair." Docket 46 at 62. Bonnema told the passenger the state fair had already passed, and he responded, "Are you serious?" *Id.; see also* Ex. C at 7:44-7:48. Then the passenger explained that "he knew there was a state fair, but he didn't know where it was located," and finally stated "he wanted to be dropped off in the Twin Cities." Docket 46 at 62-63.

Bonnema found the passenger's account suspicious because: (1) the itinerary originally went from going to an Iowa state fair, to "just being dropped off in the Cities; (2) Gonzalez originally told Bonnema Leeman's Pizzeria was out of Texas, but the passenger just said the boss's residence was in the Twin Cities; and (3) if Gonzalez and the passenger were both working the same concession stand, then why would the passenger be dropped off in the Twin Cities. *Id.* at 63. By this point, Bonnema believed Gonzalez and the passenger were using the state fair and Twin Cities stories as a cover for possible criminal activity. *Id.*

Bonnema asked the passenger if there was "anything illegal in the car," and who the car belonged to. Ex. C at 8:09-8:16. The passenger said that there was nothing illegal in the car and that it belonged to Gonzalez. *Id.* at 8:10-8:16. Bonnema informed the passenger that he thought the situation was odd and that I-29 was a "common corridor for people to transport narcotics." *Id.* at 8:29-8:39. The passenger asked Bonnema if he could get out of the Volvo. *Id.* at 8:59. Bonnema said he could and that he was not being detained or arrested. *Id.* Bonnema asked if he could perform a pat down on the passenger. *Id.* at 9:11. The passenger declined. *Id.* at 10:50-11:20.

Lang, seeing Bonnema out of his vehicle and with the passenger, also stepped out of his vehicle and approached Bonnema. Docket 46 at 33; *see also* Ex. C at 9:51. Lang and Bonnema stepped to the rear of the Volvo to discuss Gonzalez's and the passenger's stories. Ex. C at 10:19-10:36. Bonnema told Lang that the Iowa State Fair had been held a month prior and that the passenger had stated Gonzalez was going to drop him off in the Twin Cities. *Id.* at 10:37-10:52. The passenger, having overheard this comment, interjected that Bonnema was "twist[ing] up the stories" when reciting the passenger's account. *Id.* at 10:50-11:20.

At that point, Bonnema returned to his patrol vehicle and brought out his K-9, Gina, who is trained to detect certain narcotic odors. *Id.* at 11:21-11:50; Docket 46 at 53-54. Gina sniffed the vehicle for narcotic odors and indicated she had picked up a scent by sitting down. Ex. C at 11:48; Docket 46 at 64. By this time, other law enforcement officers, including Spielmannn, had

10

arrived on scene. Ex. C at 11:55. Bonnema explained the situation to the new arrivals—noting that Gonzalez and the passenger had inconsistent stories as to where they were headed. *Id.* at 14:20-15:50. The officers searched the vehicle and discovered thirty-two pounds of methamphetamine. Docket 46 at 64.

After the search concluded, at 10:28 a.m., Spielmann, who had been on standby in case Bonnema or Lang needed assistance, approached and suggested to Bonnema that Moody County dispatch relay its 911 call information, Ex. A, to Brookings County dispatch, to which Bonnema assented. Ex. 8 Clip 2 at 0:55-1:20.

## DISCUSSION

### I.   Factual Objections

Gonzalez makes two factual objections to the Magistrate Judge's report and recommendation, namely (1) that Bonnema told Gonzalez he was approaching him because of an erratic driving report about twelve seconds after first approaching him, not two minutes, and (2) that Bonnema asked for his ID about eight seconds after that, not another two minutes later. Docket 48 at 2 (citing Ex. 8 Clip 1 at 00:37). Gonzalez is correct, and the court adopts those two factual changes. Ex. 8 Clip 1 at 00:37-00:43.

Gonzalez's third factual objection alleges that the magistrate judge erred in finding that Lang and Bonnema knew Moody County had received a report of erratic driving. Docket 48 at 2. Bonnema, and likely Lang, was listening to the radio channel when Spielmannn made his response broadcast to Brookings County dispatch at 9:30 a.m. *See* Docket 46 at 27-28, 56. Spielmannn

mentioned that Moody County received a complaint about a black car that was possibly a Volvo, and that the report from Brookings County likely was referring to the same vehicle. *See* Ex. 4. But the officers could reasonably infer that because Spielmann believed the two calls were about the same vehicle, the Moody County report had also concerned erratic driving. Thus, the third factual objection is overruled.

## II.   Legal Objections

### A. Whether the initial interaction between Gonzalez and the officers was consensual

The magistrate judge found that the Fourth Amendment was not implicated in the officer's initial encounter with Gonzalez because, until Bonnema took Gonzalez's ID to run it, the interaction had been consensual. *See* Docket 47 at 16. Gonzalez objects to this finding, claiming that the interaction amounted to a *Terry* stop from its conception. Docket 48 at 2-5.

The court declines to address this issue. This issue is inconsequential because, whether or not the encounter was initially consensual, as noted below, the officers had reasonable suspicion to effectuate the stop.

### B. Whether the officers had reasonable suspicion of criminal activity to conduct the traffic stop

The magistrate judge found that officers Lang and Bonnema had reasonable suspicion to believe Gonzalez was involved in illegal activity. Docket 47 at 25. Gonzalez objects to this finding. Docket 48 at 5.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government[.]" *United States v. Lillich,* 6 F.4th 869, 875 (8th Cir. 2021)

(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "For purposes of
constitutional analysis, a traffic stop is characterized as an investigative
detention, rather than a custodial arrest . . . As such, a traffic stop is governed
by the principles of *Terry v. Ohio*[.]" *United States v. Jones*, 269 F.3d 919, 924
(8th Cir. 2001). Under *Terry*, an officer may briefly detain individuals if that
officer has reasonable suspicion to believe that "criminal activity may be afoot."
*Terry v. Ohio*, 392 U.S. 1, 30, 88 (1968); *see also Delaware v. Prouse*, 440 U.S.
648, 663 (1979).

Reasonable suspicion requires "'considerably less than proof of
wrongdoing by a preponderance of the evidence,' and 'obviously less' than is
necessary for probable cause[.]" *Navarette v. California*, 572 U.S. 393, 397
(2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer's
mere "hunch," however, is not enough. *Id.* (citing *Terry*, 392 U.S. at 27).
Rather, to have reasonable suspicion, a police officer must be "able to point to
specific and articulable facts which, taken together with rational inferences
from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

Officers may "draw on their own experience and specialized training to
make inferences from and deductions about the cumulative information
available to them that 'might well elude an untrained person.'" *Arvizu*, 534
U.S. at 273 (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).  But
reasonable suspicion need not flow directly from an officer's personal
observations. *See United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018).
Officers can rely on information provided by other members of the investigative

team. *United States v. Guzman*, 926 F.3d 991, 997 (8th Cir. 2019). Reasonable suspicion is evaluated "based on the totality of the circumstances[.]" *United States v. Polite*, 910 F.3d 384, 387 (8th Cir. 2018) (quotation omitted).

Here, the information giving rise to reasonable suspicion came from the tip to Brookings County, which dispatch summarized and broadcast, and from Spielmann's response to that broadcast. Both of the original informants were unknown to Lang and Bonnema. Gonzalez argues that the tips provided to law enforcement were not reliable because the officers did not know the tippers' identities or credibility and tippers did not provide sufficient information. Docket 48 at 5. Thus, Gonzalez asserts that the tips were insufficient to furnish the officers with reasonable suspicion. *Id.*

While known informants are generally more reliable, tips given by anonymous informants can establish reasonable suspicion if accompanied by other sufficient markers of reliability. *See Navarette*, 572 U.S. at 397-99. Reliability is bolstered when tips concern events that an informant personally witnessed, s*ee Illinois v. Gates*, 462 U.S. 213, 234 (1983), or when they are wholly or partially corroborated, *United States v. Nieman*, 520 F.3d 834, 839-40 (8th Cir. 2008).

In *United States v. Wheat*, the Eighth Circuit held that an anonymous tip that accurately states some innocent details related to erratic driving was sufficient to justify an investigatory stop. *United States v. Wheat*, 278 F.3d 722, 737 (8th Cir. 2001). The court recognized that tips reporting erratic driving are subject to less rigorous corroboration requirements because of the imminent

danger presented by such driving. *Id.* at 732 n.8. In cases of possible drunk driving, "the governmental interest in effecting an immediate investigatory stop is very strong"—so strong that the intrusion upon the driver's constitutional rights is comparatively less. *Id.* at 736. Still, anonymous tips for erratic driving must

> provide a sufficient quantity of information, such as the make and model of the vehicle, its license plate numbers, its location and bearing, and similar innocent details, so that the officer, and the court, may be certain that the vehicle stopped is the same as the one identified by the caller.

*Id.* at 731. "The tip must also contain a sufficient quantity of information to support an inference that the tipster has witnessed an actual traffic violation that compels an immediate stop." *Id.* at 732. Moreover, the court concluded that the time interval between the receipt of the tip and the location of the vehicle is a factor in not only assessing the credibility of a tipper, but also in the development of reasonable suspicion. *See id.* at 731. Applying these principles, the court held an anonymous tip, provided moments after witnessing erratic driving, that described the make and color of the vehicle, listed three characters of the license plate, and provided the location and direction of the vehicle was sufficient to warrant a stop. *Id.* at 732, 737.

Here, Gonzalez asserts that because the dispatch broadcasts did not include "information about the license plate, state of registration, type of vehicle, or model[,]" they were insufficient to effectuate a stop. Docket 48 at 5. While Gonzalez correctly notes these omissions, the officers had sufficient other information to have obtained reasonable suspicion. Both officers confirmed

15

they heard Brookings County dispatch's report of a black car with dark tinted windows, observed at mile marker 127, driving north on I-29 at varying speeds, weaving from grass-line to grass-line. Ex. 2; Docket 46 at 25-26. Additionally, at least Bonnema, and likely Lang, heard Spielmann's response putting the officers on notice that Moody County had received a call that "probably" and "may be the same vehicle." *See* Ex. 4; Docket 46 at 27-28, 56. They heard Spielmannn elaborate, explaining that the Moody County report had referenced a vehicle traveling northbound from mile marker 108, black, and might have been a Volvo. *See* Ex. 4; Docket 46 at 27-28, 56.

While the reports did not include every possible description of the vehicle, they coincided—at the very least they both referred to a black vehicle traveling northbound from Moody to Brookings County. But more importantly, the broadcasts built upon one another. *See* Ex. 2; Ex. 4. Spielmann's indication that the Brookings report "probably" referred to the same vehicle likely would have led the officers to assume that the Moody County report had also been about erratic driving. *See* Ex. 4. Also, Spielmann added to the Brookings report by disclosing that the original tipper had said the vehicle was possibly a Volvo. *Id.*

Thus, the information available was sufficient under the standards set forth in *Wheat*. While the reports did not include information about the license plate, like *Wheat*, they included color, a reference to the make, and described the vehicle's location and direction. Moreover, unlike *Wheat*, there were *two* tips that corroborated each other. *See United States v. Stevens*, 530 F.3d 714,

16

719 (8th Cir. 2008) ("The corroboration of even innocent, minor details can support a finding of probable cause.").

As noted in *Wheat*, the location of Gonzalez's vehicle supports a finding of reasonable suspicion. Here, four minutes elapsed in the time between Brookings County made its broadcast (placing the vehicle at mile marker 127) and Lang's broadcast (indicating that he had potentially spotted the vehicle at mile marker 132). Docket 46 at 26. This led the magistrate judge to conclude it was "readily apparent that a car traveling 60 miles per hour can travel 5 miles in 5 minutes[,]" and thus, it followed that a car traveling slightly over 60 miles per hour could travel the distance in 4 minutes. Docket 47 at 24. Gonzalez objects to the magistrate judge's finding that the location of the vehicle at the time it was spotted by Lang played a role in creating reasonable suspicion. Docket 48 at 6. Gonzalez highlights that the officers did not have any information about how fast the vehicle was driving, only that it was traveling at varying speeds. *Id.* As such, Gonzalez asserts, "[w]ithout more concrete information, officers could not reasonably conclude that Mr. Gonzalez's vehicle was the reported vehicle based on its movement or location." *Id.*

While Gonzalez is correct—the officers had not been told how fast the vehicle was driving—it would have been reasonable for Lang to have assumed that the car was traveling at least 60 miles per hour, considering the speed limit on I-29 is 80 miles per hour. Lang specifically said he thought it would take four or five minutes for a car to twelve from marker 127 to 132. *See* Docket 46 at 26. As such, Lang could have logically concluded that the location

17

of Gonzalez's vehicle coincided with the Brookings County tip regarding erratic driving at marker 127 roughly four minutes prior. It was not necessary for Lang to know the exact speed of the vehicle in order Gonzalez's location to factor into creating reasonable suspicion.

Thus, the court overrules Gonzalez's objection with regard to the constitutionality of the stop, because, based on the foregoing, the officers had the requisite reasonable suspicion to effectuate the stop.

### III.  Whether the stop was unconstitutionally extended

The magistrate judge found that the stop was not unconstitutionally extended. Docket 47 at 34. Gonzalez objects, claiming that Bonnema unconstitutionally extended the stop when he continued to ask Gonzalez questions about his travel plans instead of running Gonzalez's ID as soon as he got it. Docket 48 at 7.

A lawful *Terry* stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (quotation omitted). The stop will become an unreasonable seizure if the officers extend it "beyond the time necessary to complete the stop's mission." *United States v. Allen*, 43 F.4th 901, 907 (8th Cir. 2022). If officers have reasonable suspicion of criminal activity, they may extend the stop. *Id.* at 907. Generally,

> [ a traffic] stop may be extended for a length of time sufficient to enable the [ ] officer to ask the driver to step out of the vehicle or wait in the patrol car, to ask about the motorist's destination and purpose, to check the validity of the driver's license and registration, and to check the driver's criminal history for outstanding warrants.

*United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008).

Here, as discussed above, Gonzalez was stopped because officers believed he had been driving erratically and Bonnema continuing to ask questions about Gonzalez's travel plans, even after he had received the ID, was permitted, particularly when Gonzalez's story was so illogical and confusing. *See United States v. Walker*, 555 F.3d 716, 719-20 (8th Cir. 2009) (stating that erratic driving gives rise to reasonable suspicion that the driver may be impaired, and a stop may be extended to investigate the possible impairment); *United States v. Mathes*, 58 F.4th 990, 992-93 (8th Cir. 2023) (stating that questions about a driver's destination were reasonably related to the officer's purpose in stopping a vehicle for careless driving and an impermissible display of a license plate). Thus, Bonnema continuing to ask questions about Gonzalez's travel plans,

To summarize, Gonzalez told Bonnema that he was going to Des Moines, Iowa for the Iowa State Fair and claimed he was going a week early to help set up a cart for the Texas headquartered pizzeria he worked for. Ex. C at 1:44-2:05. But when Gonzalez was stopped, he was several hundred miles north of Des Moines and was heading even further north. Docket 46 at 59.

After running Gonzalez's ID and discovering that the Iowa State Fair had concluded a month prior, Bonnema asked Gonzalez's passenger where the two were headed. *Id.* at 62. Contrary to Gonzalez, the passenger claimed Gonzalez was going to drop him off in the Twin Cities. *Id.* He also stated that the two worked for a pizzeria headquartered in Minnesota. Bonnema then relayed his findings to Lang. *See* Ex. C at 10:19-10:36.

Gonzalez argues that "[e]ven if [his] reported route and itinerary might have been confusing, that in and of itself does not give rise to reasonable suspicion to extend the stop." Docket 48 at 7-8. The Eighth Circuit, however, has recognized that a confusing or illogical itinerary may give rise to reasonable suspicion to extend a stop and deploy a drug dog. *See United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007). In *Lyons*, the court held that an "an experienced [Nebraska trooper] trained in highway drug interdiction" had reasonable suspicion to extend a stop and summon a drug dog based on the suspect's "unusual [travel] itinerary" between Phoenix and Chicago, the suspect's "contradictory descriptions of the friends that he had just visited," and the abnormally large amount of luggage in the vehicle. *Id.* Similarly here, Gonzalez and his passenger's conflicting and strange stories were accompanied by additional suspicious factors.

First, Lang testified that he believed the vehicle exited I-29 after he pulled out behind it in an attempt to avoid him. Docket 46 at 26-27. Though Gonzalez argues that there could be "completely innocent reasons" for such an action, *see* Docket 48 at 8, Lang testified that he commonly encounters vehicles he catches speeding attempting to exit immediately after seeing him, Docket 46 at 46. Thus, while Gonzalez may have had a perfectly lawful reason for exiting, it also would have been reasonable for Lang to have assumed, based on his experience, that Gonzalez was trying to avoid law enforcement. *See United States v. Watts*, 7 F.3d 122, 125 (8th Cir. 1993) (noting that conduct that could be consistent with guilt *or* innocence may provide an officer with

20

reasonable suspicion). *See also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that fleeing from the police, "while not necessarily indicative of wrongdoing is certainly suggestive of such[ ]").

Second, Lang testified that he believed the passenger was only pretending to pump gas when Lang first approached the vehicle. Docket 46 at 30. Gonzalez argues that the passenger pressed buttons and was genuinely attempting to pump gas until he was distracted by the officers. Docket 48 at 8. At the evidentiary hearing, Lang admitted that it was possible that Gonzalez had gone into the gas station to pay for the gas, which would explain why the passenger did not appear to do so at the pump. Docket 46 at 30-31, 48-50. But as the magistrate judge noted, the passenger never did actually pump any gas, which shows that Lang was at least reasonable in assuming that the passenger never intended to pump gas. *See id.* at 30; Docket 47 at 28.

Finally, as Lang noted even in speaking with the passenger, I-29 is "common corridor for people transporting narcotics." Ex. C at 8:10-8:16; s*ee also Wardlow*, 528 U.S. at 124 ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis.").

Thus, based on the information revealed during their interactions with Gonzalez and his passenger, the officers did not unconstitutionally extend the stop. The stop, from the time that the officers approached Gonzalez and his passenger to the time the drug dog was deployed, was only twelve minutes. The

entire encounter, including Gonzalez's arrest, was less than an hour. Ex. 8. The court finds that the stop was not unconstitutionally extended.

## CONCLUSION

Because there is no constitutional violation, the court does not suppress any evidence gathered as a result of the stop. The court adopts Magistrate Judge Duffy's recommendation as modified and denies Gonzalez's motion to suppress. Thus, it is

ORDERED that the Amended Report and Recommendation (Docket 47) denying Gonzalez's motion to suppress is adopted as modified by this opinion. The motion to suppress (Docket 35) is denied.

Dated September 15, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE